THE STATE v. CULLER, *Appellant.*

**Practice, Criminal**: JUROR, QUALIFICATION OF. One who has read the evidence taken before the coroner in a case of homicide, either as originally written or as printed in a newspaper, or who has read the evidence in a criminal cause on preliminary examination before a justice of the peace, and formed an opinion therefrom, in either case is, as matter of law, disqualified from serving as a juror in the trial of such cause. Such person can neither form one of the list of qualified jurors served on defendant before trial, nor one of the jury which tries the issue joined. NORTON and RAY, JJ., dissenting.

PER SHERWOOD, J.

1. **Criminal Law**: INSTRUCTION. An instruction on the law of self-defense, condemned as confused and misleading. HENRY, J., concurring.

2. ———— : SELF-DEFENSE, WHEN NOT ABROGATED. While one may not bring on a combat in order to wreak his vengeance on his enemy and shield himself behind the pretext of self-defense, yet where the quarrel is sudden, no felonious intent entertained, and no deadly weapon used by him at the outset, the right to defend his life against an assault with a deadly weapon still exists in his favor, and is not abrogated by reason of the fact that he began the sudden quarrel. HENRY, J., concurring.

*Appeal from Putnam Circuit Court.*—HON. ANDREW ELLISON, Judge.

REVERSED.

On the trial of the cause the court gave, among others, the following instructions which are complained of by appellant:

6. The court instructs the jury that even though they should believe, from the evidence in the cause, that Deck first struck or assaulted defendant with a club, yet if they further believe from the evidence that the deceased and his family were in the peaceable possession of the milk lot, then they had a right to lay up the rail fence surrounding it. If, therefore, they believe from the evidence that Deck, on discovering that his fence had been thrown down, was in

the act of laying up the same, and while so engaged defendant came up to him and interfered with his work by ordering him to desist, and threatening to assault him if he did not, and intending to do so, then Deck was justifiable in so assaulting defendant, if it was necessary to prevent his interference, and such assault affords no excuse for defendant in shooting deceased.

8. If the jury find from the evidence that defendant and deceased had a difficulty which resulted in the death of deceased, and that defendant commenced the difficulty, or brought it on by any willful and unlawful act of his, committed at the time, or that he voluntarily and of his own free will and inclination entered into the difficulty, then there is no self-defense in the case, and the jury should not acquit on that ground; and in such case it makes no difference how imminent the peril may have been in which the defendant was placed during the difficulty.

*S. P. Huston* and *C. W. Bell* for appellant.

The court erred in overruling defendant's challenges for cause to the jurors, Dillmer, Wells, Canby, Hargrave and Terrell. They stated on their examination that they had read the evidence taken before the coroner's inquest and had formed opinions therefrom. This absolutely disqualified them. The opinion was not formed from rumor nor newspaper reports, but on the sworn testimony. R. S. 1879, § 1897. In such case no purging can cure the disqualification. In the following cases the opinions were founded on rumor, and within the exception in section 1897, *supra*: *Baldwin v. State*, 12 Mo. 225; *State v. Rose*, 32 Mo. 355; *State v. Core*, 70 Mo. 491; *State v. Barton*, 71 Mo. 288. The case of the *State v. Walton*, 74 Mo. 271, is no authority for this case, and the same may be said about the *State v. Brown*, 71 Mo. 454. The court erred in giving the eighth instruction for the State, because there was no evidence of a mutual combat, or that defendant commenced

the difficulty. It, also, deprives defendant of the right of self-defense if he had entered into a mere assault, an affray or a battery. *Daniels v. State*, 10 Lea (Tenn.) 261; *Windon v. Comm.*, 79 Ky. 461. The instruction erroneously uses the word "difficulty." The court erred in giving the sixth instruction for the State.

*D. H. McIntyre*, Attorney General, for the State.

The jurors who had read the testimony taken before the coroner and formed an opinion therefrom, were not disqualified. R. S. 1879, § 1897; *State v. Walton*, 74 Mo. 270, and cases cited. There is no error in the sixth instruction given for the State. *State v. Brown*, 64 Mo. 373. And the eighth instruction for the State is a correct statement of the law of self-defense. *State v. Linney*, 52 Mo. 40; *State v. Underwood*, 57 Mo. 40; *State v. Ellis*, 74 Mo. 207.

SHERWOOD, J.—The defendant was indicted for the murder of one Wm. C. Deck by shooting him with a pistol. His only plea was self-defense, and there was evidence which fully supported that plea, as well as evidence of a contrary effect. Tried, he was convicted of murder in the second degree and his punishment assessed at forty years imprisonment in the penitentiary.

Three grounds are urged for a reversal of the judgment:

*First*—Overruling defendant's challenge for cause of certain members of the panel of forty from which the selection of jurors was made; one of such panel being one of the jurors who tried the issue joined.

*Second*—The giving of the eighth instruction on behalf of the State.

*Third*—Giving the sixth instruction for the State.

These grounds will be considered in their order:

I. Dillmer, one of the panel of forty, asked on his *voir dire* if he had formed or expressed an opinion as to the guilt or innocence of the accused answered " that he had formed such opinion from reading the evidence as published

in the papers taken before the coroner and that he had such opinion still." Thereupon asked by the court if he could try the case and render a verdict according to the law and the evidence regardless of everything he had previously read or heard of the case, answered he could. Asked, also, if he had any bias or prejudice for or against the prisoner, he answered in the negative, and the defendant's challenge was disallowed. Other persons summoned on the panel, Wells, Canby, Hargrave and Terrell, being sworn to answer questions, answered that " they had read the evidence taken before the coroner, and that they had formed an opinion from such testimony." Upon this the defendant challenged them for cause, whereupon similar questions, as heretofore mentioned, were asked and answered in a similar way, resulting in the defendant's challenge of them, also, being overruled.

Our statute is specific in its prohibitions that no accused party shall be required to make peremptory challenges until a panel of competent jurors is obtained. R. S., § 1,903; *State v. Davis*, 66 Mo. 684.

It is quite clear this statutory right of the defendant was denied him, so far as concerns those who " had read the evidence taken before the coroner." And Wells, one of these, was afterwards sworn on the jury that tried the cause. Section 1,897, R. S., provides " it shall be good cause of challenge to a juror that he has formed or delivered an opinion on the issue or any material fact to be tried; but if it appear that such opinion is founded only on rumor and newspaper reports, and not such as to prejudice or bias the mind of the juror, he may be sworn." The *rule* of the statute then is the absolute disqualification of every one offered for a juror who has formed or delivered an opinion on the issue, etc.; the *exception* is where such opinion is founded only on rumor or newspaper reports, and even the exception has no operative effect if they have been such as to prejudice or bias his mind. There can be no question, therefore, as to the absolute incompetency of those persons

who had "read the evidence taken before the coroner" and formed an opinion therefrom, either to form a portion of the panel of forty, or *a fortiori* to form a part of the jury which tried the issue joined as to the guilt or innocence of the accused.

It may be fairly assumed that the four persons mentioned—Wells, Canby, Hargrave and Terrell—had "read the testimony taken before the coroner," while that testimony was unpublished and in manuscript, and with equal fairness it may be assumed that Dillmer had read the same evidence after it had become readily readable in consequence of being published in a printed form. Was not Dillmer also disqualified in consequence of having formed an opinion founded on such a basis? The answer to this question turns upon another one: What are newspaper reports? I take it that if in interpreting these words we are to obey the statute in such cases made and provided; *i. e.*, that "words and phrases shall be taken in their plain and ordinary or usual sense" (R. S., § 3126), that we cannot be long at a loss for their true meaning. "Rumor and newspaper reports," if we apply the maxim *noscitur a sociis*, were intended to occupy in point of evidential force the same footing. If we look to the standards of our language rumor is found to be: "Flying or popular report; a current story passing from one person to another without any known authority for the truth of it." Webster's Dictionary. If next we turn to "report," we find it one of the synonyms of "rumor," another "hearsay," another "story;" so that when we couple the word "newspaper" with the word "reports" it would seem impossible to doubt the legislative meaning as being simply this: A rumor or current story printed in a newspaper. And the legislature must not be supposed to be either unmindful or ignorant of the meaning and of the slight value placed by the judiciary of this State on newspaper statements or reports. Speaking on this point McBride, J., in *Baldwin's Case*, 12 Mo. 223, said: "The information upon which the juror predicated his opinion

was derived from newspaper statements, which, of all other sources of intelligence, are the most uncertain and unreliable; gleaned as such matters are from streets and alleys, beer houses and oyster cellars of a large commercial city, and without any special pains being taken to ascertain the particulars of the affair." And the legislature must not be held ignorant of that other definition of newspaper reports, given by Lord Mansfield in *Wilkes' Case*, 4 Burrows 2562, where he speaks of " that *mandax infamia* from the press, which daily coins false facts and false motives." If a witness, present at the coroner's inquest, had related to one afterwards summoned on the panel the testimony as given orally before the coroner, and such an one had formed an opinion on the issue, can it be doubted that he would have been wholly disqualified under the very terms of the statute? Does the disqualification lessen because the same information comes through a medium more authentic, and, also, in a permanent and official form? Dillmer answers that he *read the evidence as published in the papers, taken before the coroner.* There is nothing to show, nor is there any reason to doubt, that this evidence was identical in every respect with that read by Wells and others. Such a publication is not, therefore, to be regarded as a mere "newspaper report," and Dillmer as much so as Wells was disqualified.

In the recent case of *State v. Stein*, 79 Mo. 330, one sworn on his *voir dire*, stated he had formed his opinion "from what purported to be the testimony of the witnesses before the coroner's jury," and afterwards, with others in like situation, he was placed on the panel and this being assigned for error, this court, speaking through Norton, J., said : " It is unnecessary to note more particularly the action of the court in overruling defendant's challenge for cause to four jurors, on the ground that from rumor and newspaper reports, they had formed decided opinions, further than to say that the rule in reference to the competency of jurors is laid down in the case of *State v. Walton*, 74 Mo. 270, and that, in passing upon the competency of

jurors, the rule should not be pushed beyond the limits therein prescribed." This language is sufficient to show that in the opinion of this court "newspaper reports" are not synonyms of a full and complete statement of the testimony published in a newspaper, and that in *Walton's Case* this court had reached the ultima Thule, beyond which judicial construction should not be permitted to pass. In *Walton's. Case*, our latest adjudication on the point in hand, of the persons summoned as jurors and challenged for cause, one had read in the local papers what purported to be a substantial statement of the testimony given before a justice of the peace, and from this had formed and expressed his opinion; and another had also read those local papers and had received a substantial statement of the testimony from parties who were present at the hearing before the justice, and had formed and expressed an opinion. I concurred in the ruling made by a majority of the court in that case; a ruling which held those persons competent to serve as jurors. Since then I have examined with much care the ruling then made in connection with the statutory provisions above quoted, and feel now constrained to say that we went a great way in that case, further, possibly, than I would be willing to go again. But be that as it may, conceding the correctness of that ruling, that case is no authority for this one, and cannot be invoked to uphold the ruling made by the court below, touching the competency of the jurors mentioned, for one of them had read "the evidence as published in the papers, taken before the coroner," and others of them " had read the evidence taken before the coroner." Our statute expressly requires that the evidence of witnesses taken before the coroner, shall be reduced to writing and subscribed by them, and such evidence is to be returned by him before the court possessed of criminal jurisdiction. 2 R. S., § 5,145.

There can be no doubt, therefore, of the absolute disqualification of those who had read the evidence officially taken in the cause, whether as written down by the coro-

ner, or whether as published in the newspapers. To rule otherwise is to rule the statute itself out of existence; to substitute for its plain and simple mandates the ever-varying discretion of each trial judge in the State; to add to the single exception named in the statute, numberless others, and to allow the oath of a juror that he can render a verdict according to the law and the evidence, to neutralize and overcome "a good cause of challenge," no matter on how firm a foundation such cause may be based; in short, to nullify the statute and trample its behests under foot. For the reason that each one of the persons mentioned was disqualified to form the panel or to sit on the jury, the judgment should be reversed.

II.    Relative to the sixth instruction, given at the instance of the State, it is scarcely necessary to say more than this, that it is confused and unintelligible, and, therefore, well calculated to mislead the jury, and is, moreover, erroneous, if it declares the doctrine, which it seems to do, that Deck was authorized and justified in striking defendant with a club, notwithstanding defendant had done no act to prevent Deck putting up his fence, and that there was no self-defense in resisting such a dangerous blow.

III.    Of the eighth instruction given on behalf of the State, it may be said that if, by the word " difficulty " is meant a mere altercation, wrangle, dispute or controversy confined to words and springing up on the spur of the moment, it does not state the law. Threats made by the defendant of interfering with the building of the fence or against the deceased, unless some overt act were done with a malicious and felonious purpose in view, would not take from the defendant the right of self-defense if the deceased first struck him with a club. *Daniel v. State*, 10 Lea 261. In that case Deaderick, C. J., observed: "The charge in this case holds in effect that a person who may, by improper conduct, provoke an assault, cannot be allowed to rely on the plea of self-defense, nor can he rely upon such defense if he willingly engage in a fight, even if first assaulted and

stricken. * * Provoking words and gestures might be used from heat of blood, in a sudden quarrel, and a fight might, under such circumstances, be engaged in, during which a party might have the right to defend himself from impending danger of death or great bodily harm." See, also, 1 Wharton Crim. Law, §§ 476, 477, 485.

If, however, provocation is sought for, if the party killed is purposely provoked or assaulted in order to afford an opportunity to slay him, and then when goaded to madness he makes an assault and is thereupon killed, then the rule announced in *State v. Hays*, 23 Mo. 287, applies. In that case the jury were properly told that if "Hays intentionally brought on the difficulty for the purpose of killing Brown," he was guilty of murder. The fifth instruction for the State recognizes this principle, which is conspicuously absent from the one under discussion. Were it the rule, as announced in the eighth instruction, then a person who, without any ulterior or malicious purpose should, on the street, begin some sudden wrangle, altercation or dispute, or be the aggressor in some casual combat without weapons or malicious purpose, the party assailed either with tongue or fist, could draw a deadly weapon and take his life, and he be defenseless before his adversary, or a murderer if he successfully resisted the murderous assault. Such a doctrine, in my opinion, is consistent with neither reason, humanity or law. And it is only when the wordy quarrel or the actual non-felonious combat is provoked by the commencer or aggressor in order to afford opportunity for him to kill his adversary, that the right of self-defense ceases, and the authority of *Hays'* case can successfully be invoked. This seems to be the view entertained in *State v. Christian*, 66 Mo. 138, for after citing the cases of *State v. Starr*, 38 Mo. 270; *State v. Linney*, 52 Mo. 40; *State v. Underwood*, 57 Mo. 40; and quoting from them in reference to a party who "seeks and brings on a difficulty," NORTON, J., says: "Where the combat is the immediate conse-

quence of a sudden quarrel, and not an act of deliberation or agreement, it might be different."

The result reasonably deducible from the authorities cited and quoted from seems to be this, that while you may not bring on a combat in order to wreak your vengeance on your enemy, and then shield yourself behind the pretext of self-defense, yet where the quarrel is sudden, no felonious intent entertained, no deadly weapon used by the accused at the outset, that there the right to defend his life against an assault with a deadly weapon still exists in his favor and is not abrogated by reason of the fact that he began the sudden quarrel.

Since writing the above, I have found a case which bears a close analogy to the present one. The case arose in North Carolina, a state where adjudications on the subject of murder are imbued with all the stern rigor of the ancient common law. In the case referred to, the defendant was convicted of murder in the first degree. He had been stabbed by the deceased, but he had "brought on the difficulty" by striking the deceased a blow with his fist, when the deceased stabbed him, and he thereupon stabbed and killed the deceased, but in circumstances which rendered it doubtful whether the act of the prisoner was the result of passion in consequence of being stabbed, or was necessary in self-defense, and Gaston, J., observed: "It was necessary that the jury should, in the first place, ascertain whether the prisoner commenced the affray with a preconceived purpose to kill the deceased, or to do him great bodily harm. For if he did, then there was nothing in the subsequent occurrences of the transaction, which could free him from the guilt of murder. If the first assault was made with this purpose, the malice of that assault, notwithstanding the violence with which it was returned by the deceased, communicates its character to the last act of the prisoner.    *    *    If, upon consideration of all the evidence, the jury came to the conclusion that the first assault of the prisoner was not of malice prepense, then

the subsequent occurrences demanded their careful consideration, because upon these the prisoner's guilt might be extenuated into manslaughter, or excused as a homicide in self-defense." *State v. Hill*, 4 Dev. & Batt. 491. This case fully supports and maintains the views I have hitherto expressed.

For the reasons heretofore given, the judgment should be reversed and the cause remanded. HOUGH, C. J., and HENRY, J., concur in the first paragraph of this opinion, and NORTON and RAY, JJ., dissent. HENRY, J., concurs, also, in the other paragraphs.

The judgment is reversed and the cause remanded on account of the error mentioned in the first paragraph.

NORTON, J., DISSENTING.—Not being able to concur in the opinion of a majority of the court, and believing as I do that the rule which it establishes will render an efficient administration of the criminal law difficult, if not wholly impractical in many cases, and is not in accord with the current of authorities, it is but proper that I should give my reason for dissenting.

I understand the rule established by the opinion to be: That it is a good cause for the peremptory challenge of a juror in a criminal case, if when examined on his *voir dire*, he states that he has read the evidence taken before a coroner or justice of the peace as reported in a newspaper, and has formed an opinion from such report, even though he declares that if accepted as a juror he would be wholly uninfluenced by such opinion, and would be governed solely by the evidence, and even though the court required to pass upon his competency should be satisfied of his impartiality, and that when such a juror is accepted it will be reversible error, although the facts of the case fully and completely sustain the verdict.

In the march of progress and civilization the fact is not to be ignored that in every county of the commonwealth there are one or more newspapers, and that, as a rule, they

are read with avidity by all the citizens who can read, and that when a homicide is committed and an investigation is had the enterprising journalist publishes the facts with all attending circumstances, as shown by a preliminary examination, either before a coroner or justice of the peace, and that such accounts are sought after and read with eagerness, and it is just as impossible for the reader not to be impressed by it and not to have some opinion concerning it, as it would be to throw black ink on a white wall without coloring it. One of these results is produced by a law of the mind and the other by a law of matter. The legislature giving recognition to this law of the mind, expressly provided that opinions formed from such newspaper reports and rumors should not disqualify a person from being a juror, unless it should further appear that such opinion would bias his judgment and prevent him from trying the case impartially and according to the evidence adduced on the trial. The rule of exclusion, established by the opinion, utterly disqualifies all such readers from becoming jurors, and the result would be that the citizen charged with a crime would, of necessity, be compelled to have his cause submitted to a jury composed of the most ignorant class in the community, if the State should exercise its right of challenge.

In treating of this question Judge Scott observed, in the case of the *State v. Davis*, 29 Mo. 391, "that the jurors were examined on their *voir dire* and stated that they had formed an opinion from rumors, but it was not such as to bias or prejudice their minds. * * Such jurors have invariably been held competent, and the course of decision will not be varied because complaisant men, in a long course of cross-examination by counsel, may give an answer somewhat favorable to those who may wish to exclude them. Such is the growing aversion to serving on juries, that unless the rule is adhered to it will be impossible to obtain competent jurors." More than forty years ago, this court in passing upon the case of *Baldwin v. The State*, 12 Mo. 223, sustained the action of the circuit court in accepting as competent a

juror who had formed an opinion from newspaper state-
ments, and who also stated that he had no prejudice or bias·
on his mind, observed, through Judge McBride: "If,
therefore, the question of competency is referable to the·
juror himself, he was competent; but it was not his prov-
ince to pass upon that question; he could only state facts,.
and it was the duty of the court to decide whether accord--
ing to the facts he was competent. In deciding this ques-
tion the presiding judge at the trial, having the juror before
him, witnessing the manner of his examination, possessing·
a knowledge of his character, is infinitely better qualified
than we are to determine whether under all the circum-
stances his mind and feelings are in a condition which will·
enable him to discharge honestly and impartially his duty·
as a juror. Where the juror qualifies himself under the·
statute and the presiding judge accepts him, this court can-
not say an error has been committed."

In the recent case of *Reynolds v. United States*, 98 U. S.,
145, it was observed: "That in these days of newspaper·
enterprise and universal education every case of public in-
terest is, almost as a matter of necessity, brought to the
attention of intelligent people in the vicinity, and scarcely
any one can be found among those best fitted for jurors who
has not read or heard of it, and who has not some opinion
in respect to its merits. It is clear, therefore, that upon the·
trial of the issue of fact raised by a challenge for such cause,
the court will be practically called upon to determine
whether the nature and strength of the opinion formed are
such in law as necessarily to raise the presumption of par-
tiality. The question thus presented is one of mixed law
and fact—to be tried, so far as the facts are concerned, like.
any other issue of that character—upon the evidence. The
finding of the trial court on that issue ought not to be set
aside by a reviewing court, unless the error is manifest.
No less stringent rules should be applied by the reviewing·
court than those which govern in the consideration of mo--
tions for new trials, because the verdict is against the evi--

dence. * * In such cases the manner of the juror while testifying is oftentimes more indication of the real character of the opinion than his words. * * Care should therefore be taken by a reviewing court not to reverse the ruling below upon such a question of fact except in a clear case." So in the case of *Ortwein v. Commonwealth*, 76 Pa. St., 414, when five jurors stated that they had formed opinions from newspaper accounts or rumors, or both, and that the opinion thus formed they still had, and that it would take evidence to remove their opinions, they were all held to be competent jurors, although one of them had formed his opinion from reading a newspaper containing a report of the evidence at the coroner's inquest. As distinguished a judge as Agnew, C. J., who delivered the opinion, said: "Much weight is to be given to the judgment of the court below in whose presence the juror appeared and by whom his manner and conduct, as well as his language, are scrutinized." The same doctrine is announced in the case of *Myers v. Commonwealth*, 79 Pa. St. 308, and *Curley v. Commonwealth*, 84 Pa. St. 151; *Balbo v. People*, 80 N. Y. 484, and *Cox v. People*, 80 N. Y. 500; also in Indiana, case of *Guetig v. State*, 66 Ind., 94; in Iowa, in case of *State v. Lawrence*, 38 Io. 51; in Illinois, 94 Ill. 299; in Florida, 9 Flor. 215; in California, *People v. Welch*, 49 Cal. 174; also in Mississippi, Alabama and Texas—in cases of *Ogle v. State*, 33 Miss. 383; *Carson v. State*, 50 Ala. 134; *Thomas v. State*, 36 Texas 315.

If, as the above authorities decide, the fact as to whether a juror who has formed an opinion from rumor or newspaper reports, and who states that such opinion would not bias his judgment, but that in the trial of the cause he would be governed solely by the evidence, is a competent juror is to be determined by the court in which the trial is had, and that the decision when made ought only to be disturbed on the same ground that would justify setting aside a verdict on the ground that it was not supported by the evidence. Under this rule, before the action of the trial

judge in deciding that, notwithstanding such opinion, the juror was competent, the evidence upon which he determined that fact must so preponderate against the finding as to induce the belief that his finding was the result of passion, prejudice or partiality; for this court has held in numerous cases, and it has long been the established law of this State, that even in criminal cases it will not interfere nor set aside the verdict of a jury when it is asked to be done on the ground that it is against the evidence, when there is any evidence to support it, or when the evidence so strongly preponderates against the verdict as to lead to the conclusion that it was the result of partiality or prejudice. "It is only when there is a total lack of evidence, or it fails so completely to support the verdict that the necessary inference is that the jury must have acted from prejudice or partiality, that we will attempt to relieve for that cause, even in a criminal cause." *State v. Cook*, 58 Mo. 546.

This principle is ignored in the opinion of the court. Under the construction therein placed upon the statutes, whenever it appears that the opinion of the juror has been formed from reading a newspaper report of the evidence taken before the coroner, he is disqualified as a matter of law, although it be made abundantly to appear to the trial court, from the evidence of the juror, his character and standing, his demeanor while delivering his evidence, that the opinion so formed was not such as to affect his impartiality in the slightest degree. This, in my view, is subversive not only of the best interests of social order, but of the best interests of those criminally charged. One of the jurors said he had read the evidence taken before the coroner reported in a newspaper, and four others that they had read the evidence taken, without further qualification, and what I have here written, has been on the hypothesis that all of them referred to the evidence as reported in the newspaper. An opinion formed from such newspaper reports stands upon the same footing, under our statute (even under the maxim *noscitur a sociis*) as one formed from rumor

·or hearsay, except in one case it is printed hearsay, and in the other spoken. It is just such printed hearsay which may form the basis of an opinion which the legislature intended should not disqualify, when it should appear to the court passing upon his competency, that such opinion would neither bias his judgment nor affect his impartiality.

The construction placed upon the statute would put it in the power of a person criminally charged to disqualify ·every person in a county from serving on a jury by simply having a newspaper to publish a report of the evidence ·taken before a coroner or a justice of the peace; place the paper in the hands of all subject to jury duty who could read, and have it read to those who could not read, and when the cause is called for trial, and the sheriff is required to summon a jury, he brings in platoon after platoon of an hundred each, till the whole population of an entire county ·subject to jury duty has been compelled to abandon their various vocations and pursuits and appear before the court to be peremptorily challenged and sent home on the ground that they had formed an opinion from a newspaper report ·of the evidence taken before a committing magistrate or ·coroner, the prisoner thus escaping a trial and ultimately obtaining his discharge because a jury cannot be found in the county competent to try him. Just in proportion to the enormity of a crime, committed under circumstances the most revolting, shocking the community and the moral ·sense of mankind, are the probabilities increased of bringing about such a state of things. In my view of it, it was ·such a condition of things that the legislature was guarding ·against and intended to prevent when it was declared by ·statute that an opinion formed from newspaper reports ·should be no cause for challenging a juror when it appeared· to the trial court that the opinion would not bias his judgment nor influence him in the trial of the cause. In the ·views herein expressed RAY, J., concurs.